DUGAN *v.* BOYNE CITY, GAYLORD & ALPENA RAILROAD CO.

1. NEGLIGENCE — RAILROADS — FELLOW-SERVANTS — TRAIN DISPATCHER.

A railroad company is chargeable with negligence upon testimony that the train dispatcher having authorized one train to leave certain loaded cars on the main line, ordered a second train to proceed along the same track, knowing that no lights were used on standing cars and that the second train crew did not know of the standing cars.

2. SAME—CONTRIBUTORY NEGLIGENCE.

The plaintiff is not guilty of contributory negligence, as a matter of law, because he had been informed by the dispatcher that there might be switching going on at the place in question, when he testified that he slowed down to three or four miles an hour and watched for the switching, and that he saw no lights, such as would be seen if switching was being done at that point, although he knew that on standing cars no lights were used

Error to Otsego; Sharpe, J. Submitted June 22, 1909. (Docket No. 98.) Decided November 5, 1909.

Case by Grant Dugan against Boyne City, Gaylord & Alpena Railroad Company for personal injuries. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Harris & Ruegsegger* (*W. L. Townsend,* of counsel), for appellant.

*De Vere Hall,* for appellee.

MOORE, J. Plaintiff recovered a judgment for injuries received in a collision while he was at work as an engineer. The defendant has brought the case here by writ of error.

Defendant operates a railroad, the main line of which

extends from Boyne City southeast to Gaylord. Four miles or thereabout east of Boyne City a branch of the road leaves the main line and runs east, which is known as the "Thumb Lake branch." The place where the branch leaves the main line is known as Cushman. Southeast from Cushman is another branch running directly south from the main line, known as "Headquarters branch." This place is known as Project. Where the Thumb Lake branch joins the main line at Cushman, there is a curve in the main line. Near the main line and on the Thumb Lake branch at Cushman there is a side track and switch, making three tracks in all. The side track lies to the northeast of the Thumb Lake branch, and the switch from the branch to the side track is 10 or 12 car lengths east from the switch opening from the Thumb Lake branch onto the main line.

Plaintiff was an engineer employed on the main line on a logging train. His conductor was Fletcher Betterly. On the day of the injury a train hauled by engine No. 2 was operating on the Thumb Lake branch, Mr. English, conductor. Mr. English and Mr. Betterly were experienced men. Trains were operated from the office at Boyne City by lines of telephones established along the lines of the road. On the night of October 28th the train with engine No. 2 stalled on Interlocker hill, about half a mile east of Cushman on the Thumb Lake branch. When the train stalled, it was backed to the foot of the grade, and cut in two, and the forward section, containing 12 cars, was taken to Cushman, and left on the main line without any lights or anybody in charge of it. The crew then went after the other cars. Conductor Betterly, with the train hauled by engine No. 7, called the dispatcher from Project, and asked for orders. After receiving his orders, he communicated them to the plaintiff, who ran his train to Cushman, where the collision occurred. This train consisted of 21 loads of logs and wood.

The train dispatcher at this time was a young man about 18 years old. The orders were given over the tele-

phone. The conductors and the train dispatcher do not agree as to what the orders were. The claims of the parties in relation to them, and the effect to be given to them, were stated by the circuit judge to the jury as follows:

"It is the claim of the plaintiff in this case that the conductor, English, was authorized or permitted, whichever term might be best, to place that part of his train which they had pulled up from the grade below upon the main line of track; that he was permitted to place it there east of the junction point, and to leave it there without any guard or anyone to take care of it; that the dispatcher informed him that he would protect that part of his train which was left on the main line of track; that is the claim of the plaintiff in this case.

"There is no dispute further about the fact that soon after that, and it doesn't appear from the evidence that it was very long, the train on which Mr. Betterly was conductor and the plaintiff, Mr. Dugan, was engineer, coming along the main line of track, had arrived, perhaps about that same time, at a place called Project; that there the conductor, Mr. Betterly, went to the telephone office, and asked for orders to proceed along the main line.

"Now dispute arises as to the orders that he then received. And it is for you to say what the fact is in connection with it. The dispatcher represents the railroad company. He and the conductors and engineers and trainmen are not what we term in law fellow-servants. They are not responsible for each other's acts. His act in giving orders to these conductors was the act of the railroad company itself. It wasn't the act of a fellow-servant of these trainmen. Now, it will be apparent to you as to what his duty was. You must first determine as to what instructions he had given relative to the placing of this train on the main line to Conductor English; and, if he permitted that train to be placed there without any guard over it, it was then his duty, of course, to give such instructions to the train coming along the main line as would make it the duty of that engineer in charge of that train to so handle and operate his train while proceeding along towards that point as not to meet with a collision. Now, it is a question of fact for you to determine, and one that I cannot aid you in determining, as to whether or not the order given by him was sufficient for that purpose. If it was, if that

order was reasonably sufficient to apprise the engineer of the fact that cars would be left standing there unguarded and unprotected, then it was the duty of the engineer to so operate and haul his train when approaching that spot as to prevent a collision; and, if a collision resulted, the company would not be to blame for it.

"On the other hand, if that order given by the dispatcher to the engineer through Conductor Betterly was not sufficient in form to apprise him of the fact that cars had been left there on the main line, but that they would probably or likely or might be there when his train reached that point, then I say to you that the company would be liable to him for such damages as he sustained by reason of the collision with such cars, unless you find that he was at fault and in some way himself contributed to his injury. Now, by that I mean that even if such cars were left there supposing that the order given was not a sufficient order to advise him of the fact, and if on his way to that point he could have, by exercising reasonable care on his part in the manner in which he handled his locomotive, avoided the injury, it was his duty to do so. You have heard the dispute amongst the witnesses and the arguments of counsel as to the language of the order that I am not going to refer to it particularly, because it would be improper if I should in any way indicate to you that I might think the evidence has established as the real order that was given. I think I have made myself clear in connection with that point. As Mr. Dugan started his train from Project and approached Cushman, his claim is that the information that he got was that there might be switching going on at that point; and that that of itself did not advise him in any way that there was likelihood of being loaded cars standing there without anyone near them. His claim is that he watched for lights, and that he didn't see any lights. And the claim of the plaintiff is that had there been merely switching going on there, as he claims he was advised there would be, that there would have been some evidence of it, and that he was justified in proceeding in the manner in which he did. You have heard his statement in evidence of what he did do as he approached this point. Now, it is for you to say as to whether or not he did what was reasonably necessary under the circumstances as known and as they appeared to him at that time. As known to him, I mean as communicated to him by the order in question, and as appeared

to him at that time. It appears from his own evidence that, before the collision occurred, he saw this obstruction and the car or saw the rear car. Now, of course, I need not say to you that it was his duty when he saw that car to avoid if possible a collision with it. And it is for you to say whether he did that. If his own negligence—and when I say negligence as applying to him I mean it in the same sense as that applying to the defendant company— if you find that his own negligence in any way contributed to his injury, then he cannot recover in this case, because under our law we do not apportion negligence. If both parties are negligent and injury is caused on account of the joint negligence of two parties, neither can recover from the other for injuries occasioned thereby.

"Now, in determining the sufficiency of this order, I have said to you that that is an important question of fact for you to determine—the sufficiency of the order given Betterly. And in determining the sufficiency of that order given to Mr. Betterly by the dispatcher and communicated by him to the plaintiff, you have a right to take into consideration the equipment of these two freight trains. It is admitted that there was but one brakeman on each train to assist the conductor; that there were no extra lights on the train drawn by engine No. 2 (that is, not the train plaintiff was on, but the other one), and that such train was not provided with torpedoes nor fusees. Now, plaintiff knew of that fact. And the mere fact that the train was not equipped with torpedoes and fusees would not of itself, even though you might find it to be the duty of the defendant to equip its train that way, that mere fact would not entitle the plaintiff to recover in law, because he knew of the fact of the lack of equipment. But the dispatcher, the man who was sending this order governing the plaintiff in the handling of his train, he is chargeable also with knowing the manner in which these trains are equipped. He represents the company. He to all intents and purposes is the company, as we might say, because this corporation can only do business through employés or agents, and he is chargeable with notice, the same as the engineer, that these trains were not equipped with these various appliances that I have spoken of. And you have a right to take such notice and knowledge on his part into consideration in determining the question as to whether or not the orders given by him were reasonably sufficient to apprise the

plaintiff of the situation, and to lead him to expect the cars might be placed on the track as he approached Cushman in the condition in which he found them."

The testimony of the conductor, English, is, in substance, that he called up the train dispatcher, and told him that engine No. 2 at Cushman had stalled on Interlocker hill, and " I wanted orders to leave my train on main line;" that the dispatcher gave him the order, and said he would protect the train. He further testified that, if he had left a light on that portion of the train left on the main line, he would have had no light to do his work when they went after the other part of the train.

The testimony of Mr. Dugan's conductor, Mr. Betterly, is in substance that the dispatcher gave him orders to run to Boyne City.

" I called for orders at Project.    Person at Boyne answered me.    He gave me orders to run extra to Boyne City, and look out for engine No. 2 at Cushman.    They was doing some switching there; might be gone and might not.    That is as near as I remember, something to that effect.    No. 2 meant engine 2.    There was a train there with engine 2 switching there.    First he says No. 2, and I says, ' You mean engine 2,' and he says, ' Yes, sir.' I didn't have any advice that the main line was being employed. * * *    I gave Mr. Dugan his orders. I told him that engine 2 was switching at Cushman, look out for engine 2 at Cushman switching there.    They might be gone and they might not.    Then we started."

He further testified:

" If cars had been switching at Cushman, the lights on the engine could have been seen by Mr. Dugan.    As he approached Cushman, I think he could have seen from the switch to the top of the hill.    It must have been half a mile or more.    I don't think there was anything to interfere with his seeing a train if there had been one there.    I understood that engine No. 2 was switching at Cushman. That was the way I got my orders."

The testimony of the plaintiff, in substance, is:  That, after Conductor Betterly delivered him his order at Project, the train was started; that he slowed up the train

about three-quarters of a mile from where the accident occurred.

"I used my air brakes along looking for those people up there switching.

"*Q.* Now, had they been switching at Cushman, what could you have seen as you were doing that?

"*A.* I could see the lights.

"*Q.* That is moving lights back and forth?

"*A.* Yes, sir.

"*Q.* Did you see any such lights?

"*A.* No, sir.

"*Q.* Did you see any lights at all?

"*A.* No, sir.

"*Q.* Now, after shutting off your power, what did you next do with regard to the moving of your train?

"*A.* I got my speed down.

"*Q.* To what limit?

"*A.* Well, I got it down to about four miles an hour.

* * *

"*Q.* Now, from your knowledge of speed, how fast were you going from the time that you shut off your steam until the collision?

"*A.* At the time of the collision, I was going somewhere in the neighborhood of about three miles an hour, not to exceed four.

"*Q.* And what were you doing with reference to looking ahead?

"*A.* We were looking all the time.

"*Q.* Who?

"*A.* I and the fireman.    * * *

"*Q.* How far could you see with the light which you had?

"*A.* On straight track I could see 18 or 20 car lengths.

"*Q.* What was the first thing that indicated that there was an obstruction on the track?

"*A.* Car load of wood.

"*Q.* How far would you say the car load of wood was from the main line down the Thumb Lake branch?

"*A.* Well, it was about 150 feet.

"*Q.* Yes; now what occasion had you to expect any car at that point?

"*A.* I had none.

"*Q.* And situate as the car was on a curve would the light from your engine shine on it as you approached it?

"*A.* As I approached it, the closer I got to it the more my light would shine on it.

"*Q.* How close to it before the rays of your light would shine on it?

"*A.* About 10 car lengths.

"*Q.* And how close were you when you distinguished this car on the track?

"*A.* I was about eight or ten car lengths.

"*Q.* What did you do then?

"*A.* I reversed my engine.

"*Q.* And was that the proper thing to do?

"*A.* It was the only thing I could do.

"*Q.* Did you have brakes on?

"*A.* I had brakes on the engine.

"*Q.* What did you do then?

"*A.* I used them to—

"*Q.* How did you use them?

"*A.* I set them—applied them.

"*Q.* For what purpose?

"*A.* For stopping.

"*Q.* Now, what could you have done that you didn't do, in the use of mechanical appliances, to check your progress as you approached the car?

"*A.* Couldn't have done anything.

"*Q.* Well, what took place?

"*A.* We struck the cars. * * * No lantern or light of any kind was placed on this car. We struck this car of wood. I learned at that time—that is, that night—from what I saw standing on the main line there were 12 cars, and this was the one furthest east of the 12. They were coupled together to form a solid group of 12 cars. I was going, when I struck the cars, about three miles an hour. In the movement of the train with the look-out that would be regarded in ordinary railroading, as a proper rate of speed at that point under those conditions."

The defendant relies upon the following propositions:

"(1) That the injury was caused by the negligence of the plaintiff himself.

"(2) Upon the fact that the order given by the train dispatcher to Betterly under any construction that might be put upon it was sufficient to charge the plaintiff with enough knowledge to put him on guard for obstructions on the track at or near Cushman.

"(3) That, if there was negligence in leaving the cars

upon the main track at Cushman without a light or flag to guard them, it was the negligence of English, the conductor in charge of train No. 2.

" (4) That the plaintiff entirely failed to prove the giving of a negligent order to Betterly at Project, in this: that his testimony shows two different orders, one of which is claimed to be insufficient and the other substantially admitted to be a sufficient order."

Whether these attempted defenses have force or not depends upon a disputed question of fact. The record shows, beyond any controversy, that Mr. Betterly was ordered to run his train from Project to Boyne City. It also shows that, in order to do so, the train must pass over the main line at Cushman; that the train dispatcher, before issuing the order to Mr. Betterly, had authorized Conductor English to leave the rear of his broken train on the main line at Cushman, while he went after that portion of the train at Interlocker hill. It ought to be too plain for argument that, if, under these circumstances, the train dispatcher issued the order to Conductor Betterly, without informing him that the rear end of the train was on the main line, he failed in the performance of a clear duty. It does not require any great knowledge of railroading to know, what is disclosed by the testimony in this case, that a switching crew would not be engaged in switching cars at a station after dark without the use of lights. If the order was given by the train dispatcher as claimed by the testimony, then the other pivotal questions are all questions of fact. Whether the order was given by the dispatcher as claimed by plaintiff was also a question of fact. These questions were all properly submitted to the jury, which found against defendant.

Judgment is affirmed.

OSTRANDER, HOOKER, McALVAY, and BROOKE, JJ., concurred.